IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO: 3:03CV505

| | |
|---|---|
| VANCE SOUTHARD,<br>Plaintiff<br><br>vs.<br><br>MICHAEL D'AMELIO,<br>Defendant. | **MEMORANDUM AND RECOMMENDATION** |

**THIS MATTER IS BEFORE THE COURT** on the Defendant's "Motion to Dismiss Based on Lack of Personal Jurisdiction, or in the Alternative, to Transfer Venue to Massachusetts" (Document No. 9), "Memorandum in Support ..." (Document No. 11), "Affidavit of Kevin M. McGinty in Support ..." (Document No. 10) and "Affidavit of Michael D'Amelio in Support ..." (Document No. 12), filed October 27, 2003; the Plaintiff's "Memorandum ... in Opposition ..." (Document No. 20), "Affidavit of M. W. Glover in Opposition ..." (Document No. 17), and "Affidavit of Vance Southard in Opposition ..." (Document No. 19), filed November 21, 2003; Plaintiff's "Amended Affidavit of Vance Southard in Opposition ..." (Document No. 21), filed December 4, 2003; Defendant's "Reply Memorandum in Further Support ..." (Document No. 22), "Supplemental Affidavit of Kevin M. McGinty in Support ..." (Document No. 23), and "Affidavit of G. Lawrence Bero in Support ..." (Document No. 24), filed December 8, 2003; and Plaintiff's "Motion for Leave to File Sur-Reply in Opposition ..." (Document No. 25) and "Sur-Reply in Opposition ..." (Document No. 26), filed December 17, 2003.[1]

---

[1] Defendant responded by letter, dated December 23, 2003, to the Plaintiff's "Motion for Leave to File Sur-Reply" and "Sur-Reply."

1

The instant motions have been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and are ripe for disposition.

Having considered the written arguments, the record, and applicable authority, the undersigned respectfully recommends that Defendant's "Motion to Dismiss Based on Lack of Personal Jurisdiction, or in the Alternative, to Transfer Venue to Massachusetts" (Document No. 9) be <u>granted in part and denied in part</u>, that is, that the motion to dismiss based on lack of personal jurisdiction be granted and the motion, in the alternative, to transfer venue to Massachusetts be denied as moot.

## I. FACTUAL AND PROCEDURAL HISTORY[2]

In 1993, while Michael D'Amelio was the president of TACC International Corporation ("TACC") and Vance Southard was employed as the Regional Sales Manager for Continental Brands Corporation ("Continental"), certain assets of Continental were purchased by TACC. In connection with that acquisition, TACC issued shares of "phantom stock" under a compensation plan to select Continental and TACC employees (the "Phantom Stock Plan"). Mr. Southard received ninety-one phantom shares pursuant to the Phantom Stock Plan, dated October 5, 1993, between Mr. Southard and TACC. The Phantom Stock Plan provided, in pertinent part, that:

> [i]n the event of a sale of TACC ... to an outside party, the value of the Phantom units will take on the value as assigned to the Common Stock in the sale. The payout to the holder of the Phantom units will be on the same basis as the terms of the sale of the Common Stock.

Pursuant to a Stock Purchase and Sale Agreement, dated September 17, 1998 (the "Sale

---

[2] For the purposes of this motion to dismiss, all relevant pleading allegations are taken – and the factual recitation here is made – in the light most favorable to Mr. Southard. <u>CEM Corp. v. Personal Chemistry AB</u>, 192 F. Supp. 2d 438, 440 (W.D. N.C. 2002) (citation omitted).

Agreement"), TACC sold all of its outstanding stock to Illinois Tool Works ("Tool Works") for a purchase price of $130 million, $4 million of which was to be held in escrow and payable only if TACC achieved certain EBITDA targets for the fiscal year ended June 30, 1999 (the "Escrowed Funds"). The Sale Agreement also contained a provision for a contingent purchase price payment (the "Contingent Payment") of up to $20 million if TACC exceeded certain financial plan objectives with respect to revenues, margins and EBITDA for the fiscal year ended June 30, 1999.

The sale of TACC to Tool Works was announced at a meeting on September 19, 1998. After the meeting, Mr. D'Amelio and Mr. Southard discussed the redemption of Mr. Southard's phantom stock. According to Mr. Southard, Mr. D'Amelio told him that payment for his phantom stock would be wired to his account in North Carolina on the following Monday or Tuesday. Mr. D'Amelio did not tender any funds to Mr. Southard at that time.

In November 1998, Mr. D'Amelio sent to Mr. Southard in North Carolina a proposed agreement cancelling the phantom stock along with an ownership table showing that Mr. Southard's phantom stock was valued at $220,167.00. Mr. Southard traveled to Massachusetts to meet with Mr. D'Amelio regarding the proposed agreement and ownership table. Mr. D'Amelio did not provide any documentation supporting the ownership table to Mr. Southard.

In December 1998, Mr. D'Amelio faxed to Mr. Southard in North Carolina a revised version of the proposed agreement cancelling the phantom stock along with a distribution table showing that Mr. Southard's stock was valued at $371,296.00. Mr. D'Amelio also asked Mr. Southard to sign a confidentiality agreement before Mr. D'Amelio provided any supporting documentation. Mr. Southard refused to sign the confidentiality agreement because, according to Mr. Southard, the agreement referenced the wrong corporation.

3

In January 1999, Mr. Southard contacted David Flood, Executive Vice President for Tool Works. According to Mr. Southard, Mr. Flood agreed to contact Mr. D'Amelio regarding Mr. Southard's phantom stock. Later the same day, Mr. D'Amelio called Mr. Southard in Mr. Southard's Monroe, North Carolina office. According to Mr. Southard, Mr. D'Amelio was angry that Mr. Southard had contacted Mr. Flood. Mr. D'Amelio nonetheless sent some documentation to Mr. Southard.

Mr. Southard sent the documentation to his accountant, M. W. Glover, C.P.A., C.V.A., of the Monroe, North Carolina firm of Potter & Co., P.A. and asked Mr. Glover to perform as complete an analysis as possible of the value of Mr. Southard's phantom stock. Based on that documentation, Mr. Glover calculated the value of Mr. Southard's phantom stock as $3,528,000.00 with possible additional contingency payments of $112,000.00 of the Escrowed Funds and $560,000.00 of the Contingent Payment.

Mr. Southard faxed Mr. Glover's evaluation to Mr. D'Amelio in his Massachusetts office. After Mr. D'Amelio received the fax, Mr. D'Amelio called Mr. Southard in his Monroe, North Carolina office. During that conversation, Mr. D'Amelio and Mr. Southard were unable to reach an agreement on the value of the phantom stock.

At some later point, Mr. Southard called Mr. Flood once again. Mr. Flood told Mr. Southard that Mr. Flood was meeting with Mr. D'Amelio on a separate matter and would discuss the phantom stock issue with him.

After Mr. Flood and Mr. D'Amelio met, Mr. D'Amelio telephoned Mr. Southard. Although Mr. Southard and Mr. D'Amelio disagree as to who initiated the trip and when that trip occurred, it is undisputed that after the telephone call, Mr. D'Amelio traveled to North Carolina to meet with

4

Mr. Glover and Mr. Southard. According to Mr. Southard, Mr. D'Amelio offered to travel to North Carolina. Regardless, Mr. Southard picked Mr. D'Amelio up at the Charlotte airport and drove him to and from the meeting. At the meeting, Mr. D'Amelio discussed with Mr. Glover additional information regarding the value of the phantom stock. Mr. Southard and Mr. D'Amelio also discussed their dispute over the phantom stock during both car rides.

In February 1999, Mr. D'Amelio faxed to Mr. Southard in North Carolina additional information regarding the value of the phantom stock. Mr. Glover, presumably using that additional information, then completed a new valuation, in which he calculated the value of Mr. Southard's phantom stock as $3,104,556.00 plus 4.96% of any Contingent Payment. Mr. Southard faxed a copy of Mr. Glover's valuation to Mr. D'Amelio in Massachusetts.

Over the next several months, Mr. Southard and Mr. D'Amelio continued to negotiate the value of the phantom stock. Eventually, Mr. Southard and Mr. D'Amelio reached a compromise and entered into a Settlement Agreement (the "Settlement Agreement"), dated May 19, 1999, which provided that Mr. D'Amelio would pay Mr. Southard $2,238,400 by wire transfer into Mr. Southard's bank account in North Carolina and would furnish certain documents to Mr. Southard. The Settlement Agreement further provided that Mr. Southard would be entitled to (i) up to $161,600 of the Escrowed Funds pursuant to the Sale Agreement and (ii) ten percent of any Contingent Payment pursuant to the Sale Agreement. Mr. Southard and TACC, with Mr. D'Amelio signing on its behalf, also entered into a Cancellation Agreement (the "Cancellation Agreement"), also dated May 19, 1999, which provided that the phantom stock be cancelled.

Mr. D'Amelio executed the Settlement Agreement and the Cancellation Agreement at his office in Massachusetts and then sent the agreements to Mr. Southard's attorney by first class mail.

Pursuant to the Settlement Agreement, Mr. Southard received $2,239,400 by wire transfer from a bank account belonging to Mr. D'Amelio and located in Massachusetts.

At the time for any payment of the Escrowed Funds and the Contingent Payment, a dispute arose between Mr. D'Amelio and the other former TACC shareholders, on one hand, and Tool Works, on the other hand, with respect to whether TACC had achieved the financial targets as specified in the Sale Agreement. Mr. D'Amelio, the former TACC shareholders and Tool Works attempted to resolve their dispute through mediation, but those attempts failed. Subsequently, several lawsuits were filed, the primary one of which was styled *Michael A. D'Amelio, et al. v. ITW Finance II, L..L.C. and Illinois Tool Works, Inc.*, Civil Action No. 00-11266-RCL, in the United States District Court for the District of Massachusetts. Mr. D'Amelio and the other former TACC shareholders asserted various claims against Tool Works for its non-payment of the Contingent Payment and alleged improper retention of the Escrowed Funds. Tool Works asserted counterclaims alleging that Mr. D'Amelio and other former TACC officers fraudulently misrepresented aspects of TACC's earnings, inventory and accounts receivable, thus breaching the Sale Agreement and artificially inflating the worth of TACC.

Mr. D'Amelio, the other former TACC shareholders and Tool Works entered into a Settlement Agreement and Mutual General Release, dated October 31, 2002, pursuant to which (i) Tool Works retained the Escrowed Funds, including any interest earned thereon; (ii) the former TACC shareholders did not receive any Contingent Payment; and (iii) the former TACC shareholders paid an additional sum to Tool Works, over and above the Escrowed Funds.

Mr. D'Amelio currently lives in Washington and maintains business offices in Massachusetts, Florida and Washington. Mr. D'Amelio does not currently maintain, and has never

maintained, any residences, offices or bank accounts in North Carolina. Mr. D'Amelio has never paid state income taxes in North Carolina. Mr. D'Amelio has not traveled to North Carolina for any purpose since his meeting with Mr. Glover. Prior to 1991, while employed as a salesperson at TACC, Mr. D'Amelio traveled to North Carolina on business approximately twice per year.

On August 13, 2003, Mr. Southard filed a Complaint against Mr. D'Amelio in the Superior Court of Union County, North Carolina, alleging, among other things, that Mr. D'Amelio breached the Settlement Agreement. Mr. D'Amelio removed the action on October 21, 2003 and has now moved to dismiss for lack of personal jurisdiction, or in the alternative, to transfer this case to the District of Massachusetts.

## II. DISCUSSION

Mr. D'Amelio contends that the Complaint should be dismissed for lack of personal jurisdiction. In support of that contention, Mr. D'Amelio asserts that his contacts with North Carolina are insufficient to confer general or specific personal jurisdiction. He further asserts that any exercise by this Court of jurisdiction over him would be constitutionally unreasonable. Mr. Southard, of course, makes contentions to the contrary.

Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure permits a federal court to exercise personal jurisdiction over a defendant in the manner provided by state law. Fed. R. Civ. P. 4(k)(1)(A); ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 622 (4th Cir. 1997). Section 1-75.4 of the North Carolina General Statutes, the statute permitting state courts to exercise personal jurisdiction over non-resident defendants, has been construed to extend personal jurisdiction over such defendants to the full extent permitted by the Due Process Clause of the United States Constitution. Christian Sci. Bd. of Dir. of the First Church of Christ, Scientist v. Nolan, 259 F.3d

209, 215 (4th Cir. 2001). Accordingly, what would otherwise be a two-step "inquiry merges into a single issue of whether [Mr. D'Amelio] has the requisite minimum contacts with North Carolina to satisfy due process." CEM Corp. v. Personal Chemistry AB, 192 F. Supp. 2d 438, 400 (W.D. N.C. 2002).

> [W]hen a defendant's contacts with the forum state are continuous and systematic, irrespective of whether the transaction in question had sufficient contacts with the state, a court may exercise *general* personal jurisdiction over the defendant. In the absence of continuous and systematic contacts, a court may still exercise *specific* personal jurisdiction when the contacts related to the cause of action and create a substantial connection with the forum state.

Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners, 229 F.3d 448, 450 (4th Cir. 2000) (citations omitted) (emphasis in original).

### General Personal Jurisdiction

Given the requirement that minimum contacts to support general personal jurisdiction be continuous and systematic, it is clear that the threshold to establishing general personal jurisdiction is a high one. ESAB Group, 126 F.3d at 623-24. Indeed, the Fourth Circuit disfavors a broad interpretation of general jurisdiction and instead restricts the exercise of such jurisdiction to those instances in which there is continuous, substantial activity of a nature such as to justify suit. Nichols v. G.D. Searle & Co., 991 F.2d 1195, 1199-1200 (4th Cir. 1993).

In this case, it is undisputed that Mr. D'Amelio is not a resident of North Carolina and never has been. He owns no property in North Carolina and does not maintain an office or a bank account within North Carolina. He has never paid state income taxes in North Carolina. Furthermore, Mr. D'Amelio has not traveled to North Carolina for any purpose since his meeting with Mr. Glover. Mr. Southard does not, and cannot, dispute that Mr. D'Amelio's contacts with North Carolina fall far short of the continuous and systematic contacts necessary to support the exercise of general

jurisdiction. For the foregoing reasons, the undersigned concludes that this Court cannot exercise general personal jurisdiction over Mr. D'Amelio. Compare Diamond Healthcare of Ohio, 229 F.3d 448 (holding that general personal jurisdiction could not be exercised over a corporation that owns no property in forum state, has not solicited business in forum state, and has no clients in forum state).

### Specific Personal Jurisdiction

As noted above, however, a court – in the absence of continuous and systematic contacts – may still exercise specific personal jurisdiction over a defendant if the contacts relate to the cause of action asserted against the defendant and create a "substantial connection with the forum state." Diamond Healthcare of Ohio, 229 F.3d at 450 (citation omitted). The Fourth Circuit has summarized the standard for the exercise of specific personal jurisdiction as follows:

> [T]he test to be applied in considering whether the reach of personal jurisdiction inquires whether (1) the defendant has created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protections of the laws of the state; and (2) the exercise of jurisdiction based on those minimum contacts would not offend traditional notions of fair play and substantial justice, taking into account such factors as (a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and (e) the shared interests of the several states in furthering fundamental substantive social policies.

Lesnick v. Hollingsworth & Vose Co., 35 F.3d 939, 945-46 (4th Cir. 1994).

A contract with a resident of a forum state does not necessarily evince the requisite substantial connection to the forum state, even if the dispute arises out of the contract. Le Bleu Corp. v. Standard Capital Group, 11 Fed. Appx. 377, 380, 2001 WL 672066, *2 (4th Cir. 2001) (citing Burger King v. Rudzewicz, 471 U.S. 462, 475 (1985)). Instead, the contract itself

> must have a substantial connection with the State, so that the quality and nature of

> a defendant's relationship to the forum can in no sense be viewed as random, fortuitous, or attenuated.

Id. (quotations omitted) (citing Burger King, 471 U.S. at 479-80). Moreover, only contacts related to the contract at issue are relevant to the specific personal jurisdiction analysis. CEM Corp. v. Personal Chemistry AB, 55 Fed. Appx. 621, 625, 2003 WL 122510, *3 (4th Cir. 2003) (unpublished) (citations omitted).

This Court faced a factual situation in CEM Corp. v. Personal Chemistry AB, 192 F. Supp. 2d 438, strikingly similar to the one presented by this case. In that case, the defendant's contacts with the forum state, North Carolina, consisted primarily of a trip to North Carolina to negotiate the contract, telephone calls and fax transmissions to North Carolina during the negotiations of the contract and a one-time payment pursuant to the contract to the plaintiff corporation in North Carolina. The contract itself dealt with the dismissal of litigation in Sweden, which was based upon conduct allegedly infringing a European patent. CEM Corp., 192 F. Supp. 2d at 439-440, 442. Chief District Judge Graham Mullen reasoned that the contract at issue bore "little, if any, connection to the state of North Carolina" and "does not contemplate any ongoing performance or continuing course of dealing" between the plaintiff and the defendant. Id. at 442-43. He distinguished that case from those involving "some time of continuing relationship or course of dealing between the parties or between the defendant and the forum state" and cited royalty payments as one example of a continuing duty. Id. at 443. Accordingly, Chief Judge Mullen held that the plaintiff had failed to make a prima facie case of personal jurisdiction over the defendant and granted the defendant's motion to dismiss for lack of personal jurisdiction. Id. at 443-44.

The Fourth Circuit upheld that decision in an unpublished opinion, explaining that "[o]ne visit to the state, accompanied by a few telephone calls and faxes to settle litigation initiated against

it in Sweden, would not put [the defendant] on notice that it should reasonably anticipate being haled into court." CEM Corp. v. Personal Chemistry, AB, 55 Fed. Appx. at 625, 2003 WL 122510 at *3 (internal marks omitted) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)); see also Le Bleu Corp., 11 Fed. Appx. 377, 2001 WL 672066 (affirming district court's dismissal of complaint for lack of personal jurisdiction where contract between plaintiff North Carolina corporation and defendant California corporation, pursuant to which defendant would serve as financial advisor in connection with new financing, was signed in North Carolina, defendant's employees made two visits to North Carolina, parties exchanged mail and telephone calls and a payment was mailed from North Carolina).

In this case, Mr. Southard alleges that Mr. D'Amelio breached the Settlement Agreement, which involves the redemption of phantom stock in a corporation not domiciled in North Carolina. Mr. D'Amelio's contacts with North Carolina related to the Settlement Agreement can be summarized as follows: Mr D'Amelio and Mr. Southard exchanged telephone calls and fax transmissions during the negotiations of the Settlement Agreement; Mr. D'Amelio traveled to North Carolina to negotiate the Settlement Agreement; the Settlement Agreement was partially executed in North Carolina; pursuant to the Settlement Agreement, Mr. D'Amelio made a one-time payment of $2,239,400, and agreed to furnish certain documents, to Mr. Southard in North Carolina; and, also pursuant to the Settlement Agreement, on a date certain, Mr D'Amelio was to pay Mr. Southard up to $161,600 of the Escrowed Funds and ten percent of any Contingent Payment.

Based on CEM Corp. v. Personal Chemistry AB, 192 F. Supp. 2d 438, the undersigned finds that Mr. Southard has failed to make a prima facie showing of minimum contacts to support specific personal jurisdiction. Id. at 440 ("Where ... the court rules on a ... motion relying on the Complaint,

11

briefs, and affidavits alone, ... the burden is on the plaintiff to make a prima facie showing that personal jurisdiction exists.") (citation omitted). The Settlement Agreement has little, if any, connection with North Carolina. Its subject is the redemption of stock in a corporation not domiciled in North Carolina. Pursuant to the Settlement Agreement, Mr. D'Amelio was required to make two discrete payments of a determinable amount. There is no ongoing stream of payments and no contemplated negotiation regarding the calculation of those payments. All conduct by Mr. D'Amelio allegedly breaching the Settlement Agreement took place in Massachusetts. Because Mr. Southard has not made a sufficient showing of minimum contacts, it is unnecessary to decide whether the exercise of jurisdiction over Mr. D'Amelio would offend traditional notions of fair play and substantial justice. CEM Corp., 192 F. Supp. 2d at 444 n.3. Accordingly, the undersigned recommends that the motion to dismiss for lack of personal jurisdiction be granted and the motion, in the alternative, to transfer venue to Massachusetts be denied as moot.[3]

## III. RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that Defendant's "Motion to Dismiss Based on Lack of Personal Jurisdiction, or in the Alternative, to Transfer Venue to Massachusetts" (Document No. 9) be **GRANTED IN PART AND DENIED IN PART**; that is, that the motion to dismiss based on lack of personal jurisdiction be granted and the motion, in the alternative, to transfer venue to Massachusetts be denied as moot.

---

[3] Contrary to Mr. Southard's contentions, Regency Lighting Corp. v. Galaxy Elec. Manuf., Inc., 933 F. Supp. 507 (M.D. N.C. 1996), does not direct a decision to the contrary. In that case, the contract at issue called for the plaintiff to dismiss litigation pending in North Carolina against the defendant. Id. at 512. As such, the subject of the contract is inextricably connected to North Carolina. As the United States District Court for the Middle District of North Carolina found, that is "clear evidence" that the defendant "purposefully created a substantial connection to North Carolina." Id. at 512 (citation omitted).

## IV. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. United States v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D. N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to *de novo* review by the district court, Ridenour, 889 F. 2d at 1365, and may preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties.

**IT IS SO RECOMMENDED**, this 2nd day of December, 2004.

_____
DAVID C. KEESLER
UNITED STATES MAGISTRATE JUDGE

rlb

United States District Court
for the
Western District of North Carolina
December 2, 2004

* * MAILING CERTIFICATE OF CLERK * *

Re: 3:03-cv-00505

True and correct copies of the attached were mailed by the clerk to the following:

    Lisa A. Tenerowicz, Esq.
    Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
    One Financial Center
    Boston, MA  02111

    Hillary F. Meltz, Esq.
    Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
    One Financial Center
    Boston, MA  02111

    Samuel M. Starr, Esq.
    Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
    One Financial Center
    Boston, MA  02111

    Bradley R. Kutrow, Esq.
    Helms, Mulliss & Wicker, PLLC
    201 N. Tryon St.
    Charlotte, NC  28202

    Koy E. Dawkins, Esq.
    P.O. Drawer 399
    Monroe, NC  28111-0399

cc:
Judge MCK           (✓)
Magistrate Judge    ( )
U.S. Marshal        ( )
Probation           ( )
U.S. Attorney       ( )
Atty. for Deft.     ( )
Defendant           ( )
Warden              ( )
Bureau of Prisons   ( )
Court Reporter      ( )
Courtroom Deputy    ( )
Orig-Security       ( )
Bankruptcy Clerk's Ofc. ( )

Other _____ ( )

Date: 12-2-04

Frank G. Johns, Clerk

By: RLB
Deputy Clerk